**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTINA FARINA,** | : | |
| **Plaintiff**, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TEMPLE UNIVERSITY HEALTH** | : | |
| **SYSTEM LONG TERM DISABILITY** | : | |
| **PLAN, et. al,** | : | **No. 08-2473** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                    **April 27, 2009**

Plaintiff Christina Farina brings this action, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(b), against Defendants Temple University Health System Long Term Disability Plan (the "Plan") and the Life Insurance Company of North America ("LINA"), the Plan's claims administrator, challenging LINA's denial of her claim for long term disability benefits.  Currently before the Court are the parties' cross-motions for summary judgment. When an individual suffers from a chronic, disabling condition that waxes and wanes, as does Plaintiff, an insurance company may not discontinue benefits based on a brief window during which the condition improved despite evidence that the improvement was merely ephemeral.  Because LINA improperly denied Plaintiff's benefits on this basis, Plaintiff's motion is granted and Defendants' motion is denied.

## I.   BACKGROUND

### A.   Plaintiff is Diagnosed with RSD and Begins Receiving Long Term Disability Benefits

Plaintiff was a senior endoscopy technician employed by Temple University Health System in Philadelphia.  (Compl. ¶ 9; Ans. ¶ 9.)  On August 22, 2003, Plaintiff injured her left knee when she tripped over a baby gate; she was later diagnosed with Reflex Sympathetic Dystrophy ("RSD") in connection with that injury.  (Defs.' Mot. for Summ. J. [hereinafter "Defs.' Mot."] Ex. E [Administrative R. Excerpt] at LINA00044.)   RSD, also known as Complex Regional Pain Syndrome, is a chronic neurological syndrome best described as a nerve or soft tissue injury that does not heal normally.  *See* Reflex Sympathetic Dystrophy Syndrome Association, "What is CRPS?," *available at* http://www.rsds.org/2/what_is_rsd_crps/index.html (last visited Apr. 15, 2009).  Those with RSD often suffer from "continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time."  National Institute of Neurological Disorders and Stroke, "Complex Regional Pain Syndrome Fact Sheet," *available at* http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm (last visited Apr. 16, 2009).  This pain is often accompanied by a burning sensation, increased skin sensitivity, changes in skin temperature (warmer or cooler compared to the opposite extremity), blotchy or purple skin, changes in skin texture (shiny and thin, and sometimes excessively sweaty), changes in nail and hair growth patterns, swelling and stiffness in affected joints and motor disability.  *Id*.  Although some individuals with RSD experience spontaneous remission, others experience "unremitting pain and crippling, irreversible changes in spite of treatment."  *Id.*

Although Plaintiff returned to work, she reinjured her knee on the job when she walked into

an x-ray arm on February 4, 2004.  (Defs.' Mot. Ex. E at LINA00044 & Ex. F [Administrative R. Excerpt] at LINA00150.)  She was diagnosed with "recurrent RSD."  (Defs.' Mot. Ex. E at LINA00044.)  Plaintiff stopped working on April 14, 2004 and continued to receive treatment for her pain.  (Defs.' Mot. Ex. J [Nov. 19, 2004 Letter to Pl. Approving Claim for Benefits] at LINA01224.)

On July 15, 2004, Plaintiff filed for long term disability benefits.  (Defs.' Mot. Ex. H [Application for Benefits] at LINA01300.)  Pursuant to the Plan's policy, a participant is considered disabled, and therefore entitled to disability benefits, if due to injury or sickness he or she is unable "to perform all the material duties of his or her regular occupation," or "to earn more than 80% of his or her Indexed Covered Earnings."  (Defs.' Mot. Ex. B [LINA Policy] at 3.)  This definition of disability is referred to as the "own occupation" standard, since a participant meets this standard when he or she cannot perform the duties of his or her own occupation.  After disability benefits are paid under the Plan policy for two years, a Plan participant must then satisfy a different standard — the "any occupation" standard — to continue receiving benefits.  This standard is met when, due to injury or sickness, a Plan participant "is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience" or "is unable to earn more than 80% of his or her Indexed Covered Earnings."  (*Id*.)  Per the policy, "[s]atisfactory proof of Disability must be provided to [LINA] . . . before benefits will be paid."  (*Id.* at 18.)

LINA approved Plaintiff's claim for benefits and she received disability benefits of $50.00

per month under the Plan from October 13, 2004 through October 12, 2006.[1]  (Pl.'s Mot. for Summ. J. [hereinafter Pl.'s Mot.] ¶ 7; Defs.' Mot. Ex. J.)  As of October 12, 2006, to continue receiving benefits, Plaintiff was required to establish that she was disabled under the Plan's "any occupation" standard.

### B.    Plaintiff's Medical History

Since her reinjury in February, 2004, Plaintiff was seen by several doctors, including Drs. James Tweedy and Milton Soiferman, her primary care physicians; Dr. Alan Carr, a pain management specialist; Dr. Steven Mandel, a neurologist; and Dr. Philip Getson.  (Defs.' Mot. Ex. G [Dr. Topper's Review] at LINA00181-185 (summarizing Plaintiff's medical history); Pl.'s Mot. Ex. A [Administrative R. Excerpts] at LINA00415.)  She underwent various treatments including medication, physical therapy, epidurals, nerve blocks, and topical creams, often with little success. (Defs.' Mot. Ex. G at LINA00181-185.)  Dr. Evan Frank, the pain management specialist who treated Plaintiff prior to Dr. Carr, noted on March 7, 2005 that, despite these treatments, Plaintiff was still experiencing pain and, unless she sought to pursue alternative therapies, she reached her maximum medical improvement.  (*Id.*)

On December 15, 2005, LINA requested from Drs. Soiferman and Tweedy's office Plaintiff's records from September 10, 2005 through the present and asked for an estimated return to work date. (Pl.'s Mot. Ex. A at LINA00619.)  On March 23, 2006, Dr. Tweedy responded that Plaintiff was still being treated for her RSD and that it would be "impossible to determine a return to work date" because "[Plaintiff] cannot work in any capacity."  (*Id.*)  Dr. Tweedy also completed a Physical

---

[1] Plaintiff's gross benefit was reduced by her Worker's Compensation benefits.  (Defs.' Mot. Ex. J at LINA01223; *see also* Defs.' Mot. Ex. B at 5.)

Ability Assessment ("PAA") for Plaintiff, which he forwarded to LINA.  (*Id.* at LINA00620.)  The PAA listed activities, such as sitting, standing, and walking, and provided options for indicating Plaintiff's capability for tolerating those activities throughout an eight-hour workday.  (*Id.*)  The options were: (1) occasionally (1-33%) (< 2.5 hrs); (2) frequently (34-66%) (2.5 - 5.5 hrs); (3) continuously (67-100%) (5.5 + hrs); or (4) not applicable to diagnosis(es).  Dr. Tweedy noted on the form that Plaintiff could sit and stand for less than fifteen minutes and that she could walk for less than ten minutes.  (*Id.*)  She could frequently reach (overhead, at desk level and below her waist) and manipulate and grasp with her right and left hands.  (*Id.*)  However, she could not lift or carry ten pounds, push or pull, climb, balance, stoop, kneel, crouch, crawl or tolerate exposures to extreme temperatures or vibration.  (*Id.*)  He specifically noted her inability to use foot controls.  (*Id.*)  He added that "significant [RSD] precludes virtually all of the above activities."  (*Id.*)

On April 22, 2006, Plaintiff completed a form entitled "Disability Questionnaire & Activities of Daily Living," in which she indicated that she could drive for ten to twenty-five minutes.  (Pl.'s Mot. Ex. A at LINA00412.)  She noted that her regular activities included cooking for one hour a day, four days a week; doing laundry for one hour a day, two days a week; and reading and watching TV on a daily basis.  (*Id.*)  She also noted that she was capable of walking one to two blocks "not often."  (*Id.*)

Unfortunately, Plaintiff was in a car accident on July 13, 2006, while en route to an appointment with Dr. Carr to follow up on a nerve block treatment.  (Pl.'s Mot. Ex. A at LINA00442.)  Dr. Carr next met with Plaintiff on July 18th and reported that her pain was "back to its baseline," despite some pain relief following the prior nerve block.  (*Id.*)  On examination, Plaintiff exhibited allodynia and hyperesthesiae in her left leg and was wearing "very loose clothing"

5

because of the pain.[2]  (*Id.*)  Dr. Carr noted that the pain in Plaintiff's left leg was unrelated to the accident, but that she "had some restriction in range of motion of the right shoulder" as a result of the accident.  (*Id.*)  She was underwent another nerve block with Dr. Carr on August 23, 2006.  (*Id.* at LINA00443, LINA00447.)

In a September 5, 2006 letter, LINA informed Plaintiff that, as of October 12, 2006, she would have to satisfy the "any occupation" standard in order to continue receiving benefits and that LINA was awaiting medical records from Plaintiff's treating physicians.  (Defs.' Mot. Ex. K [Sept. 5, 2006 Letter to Pl.].)  On September 6, 2006, Dr. Carr completed a PAA identical to that completed earlier by Dr. Tweedy.  (Defs.' Mot. Ex. L [Carr Sept. 6, 2006 PAA].)  Dr. Carr indicated that Plaintiff could continuously sit and reach overhead, at desk level and below waist level, but that she could only occasionally stand, walk, lift or carry up to twenty pounds, and balance.[3]  (*Id.*)

Drs. Soiferman and Tweedy's office sent LINA notes documenting Plaintiff's five visits between April 21, 2006 and September 8, 2006.  (Pl.'s Ex. A at LINA00404-409.)  The notes indicate that Plaintiff continued to complain of pain and that she received constant treatment for her RSD.  (*Id.*)  Additionally, a September 8, 2006 note from Dr. Getson regarding Plaintiff's visit on that date indicated that Plaintiff reported that her condition was "20% worse."  (*Id.* at LINA00382.) Plaintiff was "having difficulty walking," was "doing poorly," her RSD "was progressing," and she

---

[2] Allodynia refers to pain from stimuli that are not otherwise painful and may occur in areas apart from the area being stimulated.  The Free Dictionary, Medical Dictionary, *available at* http://medical-dictionary.thefreedictionary.com/allodynia (last accessed Apr. 20, 2009). Hyperesthia refers to increased sensitivity to touch.  The Free Dictionary, Medical Dictionary, *available at* http://medical-dictionary.thefreedictionary.com/hyperesthesia (last accessed Apr. 20, 2009).

[3] On the form, Dr. Carr checked both "frequently" and "occasionally" regarding whether Plaintiff could lift ten pounds.  (Defs.' Mot. Ex. L.)

was exhibiting "spastic motor movement dysfunction."  (*Id.*)

In an October 2, 2006 report of a September 29, 2006 consultation with Plaintiff, Dr. Carr reported that "[a]t this time, [Plaintiff] is having a lot of pain down through the left leg and into the right arm, as well."  (Defs.' Mot. Ex. M [Oct. 2, 2006 Intermediate Consultation Report] at LINA00220.) Upon examination, Plaintiff exhibited allodynia and hyperesthesiae of her left leg and her skin was shiny and discolored.  (*Id.*)  The doctor ultimately scheduled Plaintiff for another sympathetic nerve block.  (*Id.* at LINA00221.)  In this report, Dr. Carr also responded to an IME, conducted by a Dr. Levin, which Dr. Carr had reviewed, explaining that:[4]

> I do agree with [Dr. Levin] that the patient does not have RSD, at this time.  She has had distinctive signs of RSD in the past and also one must recall that she has had appropriate responses to the sympathetic nerve blocks.  Her response to the sympathetic nerve block coupled with her other diagnostic studies including the thermogram and her characteristic findings on examination, not only by this physician, but by multiple physicians, clearly rules in the elements of RSD.  It is quite easy for a physician who sees the patient on a single visit not to fully appreciate the full complexity of the syndrome.  Certainly, during the examination not all of the signs and symptoms may be present all the time, and not only due to the fact that she has been under continuous care for her symptoms.

(*Id.*)

Plaintiff also saw Dr. Mandel, her neurologist, on September 29, 2006.  (Pl.'s Mot. Ex. A at LINA00222.)  Dr. Mandel's report of that visit explained that he knew Plaintiff to have a diagnosis of RSD in her left leg, but that he was treating her at that time in connection with the July 13, 2006 car accident, which affected her upper extremities.  (Defs.' Mot. Ex. N [Oct. 10, 2006 Letter from Mandel to Soiferman].)   The doctor reported that Plaintiff did not have RSD in her right arm, but

---

[4] The IME was never made a part of the administrative record in this case.  (Defs.' Mot. Ex. S [Excerpts from Claims Appeal File] at LINA00029 (noting that LINA was unable to obtain the IME).)

opined that she should undergo nerve blocks to prevent her RSD from spreading from the left leg

to the right arm.  (*Id.*)  The report did not discuss the status of Plaintiff's left leg.

Since the "any occupation" date was approaching, LINA requested that Vince Engel, a

Rehabilitation Specialist, perform a "Transferable Skills Analysis" in order to determine whether

Plaintiff was capable of performing occupations other than her own.  (Defs.' Statement of

Undisputed Facts ¶ 24; Defs.' Mot. Ex. O [Transferrable Skills Analysis].)  The October 12, 2006

report,  which was based on Dr. Carr's PAA, characterized Plaintiff as "functioning in the sedentary

to light level of physical demand."  (Defs.' Mot. Ex. O at LINA00461.)  Mr. Engel identified six

possible occupations that Plaintiff could perform that satisfied her wage requirement under the Plan:

holter scanning technician, protective-signal operator, surveillance-system monitor, service clerk,

claims clerk I, civil service clerk.  (*Id.* at LINA00461-62.)

### C.    LINA's First Denial of Benefits

On October 13, 2006, LINA informed Plaintiff that it was terminating her benefits.  (Defs.'

Mot. Ex. P [Oct. 13, 2006 Letter to Plaintiff].)  In a letter to Plaintiff, LINA explained its process in

evaluating Plaintiff's claim and the reasons for its termination of her benefits.  LINA had sought

information from five doctors — Drs. Soiferman, Tweedy, Mandel, Carr and Getson — in evaluating

Plaintiff's claim.  (*Id.* at LINA00456.)  However, the letter indicated that LINA did not have the

most current information regarding Plaintiff's treatment from any of these doctors.

LINA's letter to Plaintiff explained that it was terminating Plaintiff's benefits primarily

because Dr. Carr's PAA indicated that Plaintiff was capable of performing sedentary work:

> After reviewing information submitted by your treating providers we find that
> medical received no longer supports your claim to be open.  Dr. Mandel's last
> submitted note from January 11, 2006 indicates you continue to have problems but

does not note any physical examination findings or plans for future treatments. Dr. Mandel's office did notify us that you last treated on September 29, 2006, unfortunately this note has not been received. Dr. Carr's office submitted information from July 19, 2006 with notification of physical examination findings from a previous visit, but nothing recent. Dr. Carr did complete Physical Abilities Assessment form that provided restrictions that fall within a sedentary occupation. Dr. Soiferman and Dr. Tweedy [*sic*] office submitted recent documentation from September 08, 2006. These notes indicate you have complaints of pain, anxiety, and depression but they do not present any physical examination findings regarding your condition. Dr. Getson did not submit and [*sic*] recent medical documentation and you are no longer treating with Dr. Frank.

(*Id.* at LINA00458.) LINA explained that, based on these records, Plaintiff did not meet the "any occupation" standard because she was capable of performing sedentary work — work that "involves sitting most of the time, but may involve walking or standing for brief periods of time." (*Id.*)

### D.      Plaintiff's First Appeal

In a letter to LINA, Plaintiff stated that she intended to appeal this decision and would provide additional documentation. (Defs.' Mot. Ex. Q [Oct. 19, 2006 Letter from Pl. to Lesleigh Harkins].) Shortly thereafter, LINA received Plaintiff's records from August and September of 2006. (Def.'s Mot. Ex. T [Mar. 8, 2007 Letter Denying Appeal] at LINA00343; Pl.'s Mot. Ex. A at LINA00038.) Dr. Tweedy faxed LINA an up-to-date PAA on October 20, 2006. He indicated that Plaintiff had "quite severe reflex sympathetic dystrophy," which required her to see several specialists, and that she had been under continuous care since February 2004. (Defs.' Mot. Ex. R [Oct. 20, 2006 Dr. Tweedy PAA] at LINA00416, LINA00418.) He explained that Plaintiff "cannot remain in any one position for more than very short periods, and sometimes cannot tolerate even the touch of clothing on her left leg. She is fully disabled." (*Id.*) On the PAA, Dr. Tweedy indicated that Plaintiff could continuously reach at desk level, manipulate or simply grasp items with her right and left hands, see, hear and taste, and that she could lift or carry ten pounds frequently. (*Id.*) He

9

also reported that Plaintiff only occasionally could stand, walk, reach overhead, grasp firmly with her right limb, lift over ten pounds, and climb regular stairs.  (*Id.*)  Dr. Tweedy also indicated that Plaintiff never could climb, balance, stoop, kneel, crouch, crawl, use lower extremities for foot controls, push, pull, work extended shifts or tolerate exposure to any environmental extremes, and that she could sit for only twenty to twenty-five minutes before she required a position change.  (*Id.*)

The Doctor assigned to review Plaintiff's file, Dr. Paul Seiferth, opined that "only PCP - Dr. Tweedy notes no work on Physical Abilities Assessment but does not provide any office notes or medical records noting a functional loss to support restrictions of no work."  (Defs.' Mot. Ex. S [Excerpts from Claims Appeal File] at LINA00029.)  On March 8, 2007, LINA sent Plaintiff a letter denying her appeal.  (Defs.' Mot. Ex. T [Mar. 8, 2007 Letter Denying Appeal].)

### E.      Plaintiff's Second Appeal

Plaintiff requested a second appeal.  (Defs.' Mot. Ex. U [Mar. 21, 2007 Letter Requesting Second Appeal].)  She indicated to LINA that she was sending current records from Drs. Getson, Carr, Tweedy, Mandel and an RSD specialist with whom she recently began treatment, Dr. Schwartzman.  (*Id.*)

Dr. Carr's office sent LINA reports from Plaintiff's office visits on October 12, 2006, November 17, 2006, January 5, 2007 and March 9, 2007, and documentation indicating that Plaintiff underwent another nerve block on November 6, 2006.  (Pl.'s Mot. Ex. A at LINA00224-225, LINA00230-231, LINA00235-236, LINA00238; Defs.' Mot. Ex. W [Mar. 12, 2007 Intermediate Consultation Report].)  The report from Plaintiff's October visit, which focused on the injuries to Plaintiff's upper extremities, indicated that Plaintiff was "still having difficulty with her activities of daily living with using her hand above the shoulder, brushing her hair and taking care of personal

hygiene matters," but that she did not have any changes with temperature or swelling.  (Pl.'s Mot. Ex. A at LINA00224)  The report from Plaintiff's November visit indicated that Plaintiff felt considerable relief in her right arm from the nerve block, but that Dr. Carr recommended additional nerve blocks.  (*Id.* at LINA00235-236.)  His report from the January, 2007 consultation noted that Plaintiff was experiencing pain in her left leg, coupled with increased sensitivity, swelling and color changes.  (*Id.* at LINA00238.)

Dr. Carr's account of Plaintiff's March visit indicated that Plaintiff had three days of relief following a nerve block, but that the pain in her left foot subsequently returned.  (Defs.' Mot. Ex. W.)  Based on his evaluation, Dr. Carr reported that Plaintiff "has continuing signs of RSD in the left leg" including "mottling, and hypersensitivity with allodynia," and that, on the date of the evaluation, Plaintiff was not wearing a sock on her left foot because of the pain.  (*Id.* at LINA00269.) Dr. Carr clarified his earlier statement that he agreed with Dr. Levin that the Plaintiff did not have RSD at the time of his prior evaluation.  (*Id.* at LINA00270.)  He explained that he could "understand how Dr. Levine[5] . . . may have felt at the time of his report that [Plaintiff] did not have RSD because people with RSD sometimes their symptoms come and go," and that "it is not unusual not to see all signs and symptoms of RSD in an examination of a patient at any one time."  (*Id.*)  He further explained that Plaintiff clearly suffers from RSD based on her responses to certain treatments and presentation of allodynia and hyperesthesiae.  (*Id.*)

Also in the file is a letter from Dr. Mandel, who examined Plaintiff on January 29, 2007. (Pl.'s Mot. Ex. A at LINA000209.)  Dr. Mandel noted that Plaintiff had hypersensitivity in her left foot, which was cooler than the right foot, but that there was no obvious atrophy and no changes in

---

[5] The doctor's name is spelled both Levin and Levine in the letter.

11

her nails or hair.  (*Id.*)

On March 12, 2007, Dr. Schwartzman, an acknowledged renowned expert in RSD, examined Plaintiff.  (Pl.'s Mot. Ex. A at LINA00206; Defs.' Mot. Ex. G at LINA00186.)   His subsequent report indicated that she complained of "very severe pain in the entire lower left extremity" associated with swelling and color change.  (Pl.'s Ex. A at LINA00206.)  He noted that she had difficulty holding her arms above the horizontal and initiating fine movements in her upper and lower extremities, and that vibration, cold and sensation caused her severe pain. (*Id*. at LINA00208.)

To evaluate Plaintiff's second appeal, LINA requested a peer review by Dr. Leonid Topper, a neurologist.  (Defs.' Mot. Ex. G.)  Dr. Topper reviewed records from several doctors dating back to February 2004 and other documents in the file, including Dr. Carr's PAA.  (*Id.* at LINA00180.) Dr. Topper's review does not indicate whether he also reviewed Dr. Tweedy's PAA.  (*Id.*)   Dr. Topper agreed with the opinions of Drs. Mandel, Soiferman and Carr, however, he contacted Dr. Schwartzman for a clarification of the Doctor's opinion.   (*Id.* at LINA00180-81.)   In that conversation, Dr. Schwartzman conveyed that when he evaluated Plaintiff in March of 2007, her RSD had worsened "due to a motor vehicle collision and due to re-injuring her left knee."  (*Id.* at LINA00181.)  According to Dr. Topper's report, "[c]onsidering the long lasting and severe RSD, the history of extensive treatment, and the subjective and objective data on exam, Dr. Schwartzman concluded that the claimant has no functional capacity to work in any occupation due to her severe pain, right brachial plexopathy, and sympathetically-mediated changes in her left leg and right arm." (*Id*.)

Dr. Topper agreed with Plaintiff's diagnosis of RSD since it was "well documented by multiple providers" and was evidenced by "both subjective and objective signs and  symptoms of

RSD." (*Id.* at LINA00185-186.)  Relying on previous diagnoses from other physicians, Dr. Topper concluded that Plaintiff's RSD worsened in 2004 and 2005, briefly improved in the fall of 2006, and then worsened again.  (*Id.* at LINA00186.)  He noted that although no objective signs of RSD were documented between September 28, 2006 and October 12, 2006, the RSD appeared again by November 16, 2006, and that Plaintiff's doctors had observed it consistently ever since.  (*Id.*)  Although Dr. Topper believed that Dr. Carr's conclusion that Plaintiff could perform sedentary work was reasonable at the time of Dr. Carr's PAA, he acknowledged that Plaintiff's improvement was "short-living" since the RSD subsequently reappeared in severe form.  (*Id.*)  Accordingly, Dr. Topper concluded that Plaintiff "did have sedentary work abilities . . . as of 10/12/06, and through 3/12/07," but that she has "reduced functionality, incompatible with full time all work, as of 3/12/07 and to the present time."  (*Id.*)

LINA's internal claims notes indicate that it considered the outcome of Dr. Topper's review to be "ambiguous." (Pl.'s Mot. Ex. A at LINA00022.)  Nevertheless, relying heavily on Dr. Topper's report, LINA denied Plaintiff's second appeal.  (Defs.' Mot. Ex. X [June 20, 2007 Letter Denying Second Appeal].)  In its letter to Plaintiff denying this appeal, LINA explained that "[a]lthough the reappearance of your disease later occurred, the medical does not support restrictions of less than sedentary as of October 12, 2006."  (*Id.* at LINA00177.)

Having exhausted all available administrative remedies, Plaintiff filed this ERISA action seeking to recover her long term disability benefits under the Plan policy.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©. The moving party bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party makes such a demonstration, the burden then shifts to the nonmovant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial. *Id.* at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989). When evaluating a motion brought under Rule 56(c), a court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). A court must, however, avoid making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). The same standards apply to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001).

14

## III.   DISCUSSION

### A.   The Court Must Review LINA's Denial of Benefits *De Novo*

The Court must first determine what standard of review applies to LINA's denial of benefits. Defendants argue that this Court should apply an arbitrary and capricious standard of review, or, at least, a "moderately heightened standard of review" because of the structural conflict of interest resulting from LINA's dual roles in funding and administering claims under the Plan. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. [hereinafter Defs.' Mem.] at 7-11.)  Plaintiff argues that a *de novo* standard is appropriate and, at most, a "heightened standard of review" applies.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. [hereinafter Pl.'s Mem.] at 7; Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 2.)  For the following reasons, the Court determines that *de novo* review is appropriate in this case.

> 1.   *Heightened review is no longer appropriate in the wake of recent Supreme Court precedent*

In *Firestone Tire and Rubber Co. v. Bruch*, the Supreme Court announced that claims brought pursuant to § 1132(a)(1)(B) to recover benefits under an ERISA plan are governed by a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989).  Based on dicta in *Firestone*, the Third Circuit adopted a heightened form of arbitrary and capricious review for benefit claims in cases involving a "structural conflict," such as when an insurance company both funds and administers plan benefits.  *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000).  Cases warranting such a standard of review were to be analyzed using a "sliding scale approach," pursuant to which "'the fiduciary decision will be entitled

to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.'" *Id.* at 391 (quoting *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993); *see also Post v. Hartford Ins. Co.*, 501 F.3d 154, 160-65 (3d Cir. 2007) (elaborating upon this concept by listing various "structural" and "procedural" factors evidencing when an administrator acts under a conflict of interest).

Shortly after the Third Circuit decided *Post*, however, the Supreme Court issued its opinion in *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2343 (2008). The Court acknowledged that a company that both funds and administers benefits under a plan acts subject to a conflict of interest, but held that a reviewing court should "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Id.* at 2346 (citing *Firestone*, 489 U.S. at 115). In so holding, the Court specifically rejected the various modified standards of review developed by the courts of appeal to address cases in which a plan administrator acted both with discretion and subject to a conflict of interest. *Id.* at 2351 (noting that it is undesirable "for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict.")

As the Third Circuit recently acknowledged, *Glenn* was the death knell to the modified standards of review, such as the sliding-scale approach, that had developed in *Firestone*'s wake. *Estate of Schwing v. Lilly Health Plan*, — F.3d — , 2009 WL 989114, at *2 (3d Cir. Apr. 14, 2009) ("[I]n light of *Glenn*, our 'sliding scale' approach is no longer valid."); *see also Ellis v. Hartford Life and Accident Ins. Co.*, 594 F. Supp. 2d 564, 566 (E.D. Pa. 2009) ("Glenn makes clear that there is no heightened arbitrary and capricious standard of review."). Therefore, there are only two possible standards of review that could apply to this case — arbitrary and capricious or *de novo*.

16

2.      *De novo review is appropriate*

As noted above, a denial of benefits claim brought pursuant to ERISA is governed by a *de novo* standard of review unless the plan grants the administrator discretion to determine a participant's eligibility for benefits or to construe plan terms.  *See Firestone*, 489 U.S. at 115. "Whether a plan administrator's exercise of power is mandatory or discretionary depends on the terms of the plan." *Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991).  No "magic words" are required to confer discretion — discretionary powers may be granted expressly or implicitly.  *Id.*.  However, when a plan is ambiguous, it is construed in favor of the insured.  *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1258 (3d Cir. 1993).

In this case, the Plan policy provides that "[s]atisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.  The Insurance Company will require continued proof of the Employee's Disability for benefits to continue."[6] (Defs.' Mot. Ex. B at 18.)  LINA contends that this language confers discretion sufficient to warrant an arbitrary and capricious standard of review.  Plaintiff counters that this language is insufficient to trigger a deferential standard and that *de novo* review is appropriate.

Whether a plan that requires an insured to submit "satisfactory proof" to the claim administrator confers sufficient discretion upon the administrator to warrant arbitrary and capricious review is unclear in the Third Circuit.  Although other circuits are split on the issue, the weight of recent authority indicates that a plan term requiring a claimant to support his claim with satisfactory proof, absent more, fails to confer discretion upon an administrator.

---

[6] The Plan specifies that "[t]he Insurance Company underwriting this Policy is named on the Policy cover page," which identifies LINA.  (Defs.' Mot. Ex. B at 28.)

In *Herzberger v. Standard Insurance Co.*, for example, the Seventh Circuit held that a plan administrator does not possess discretion merely because the plan "requires a determination of eligibility or entitlement by the administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a determination and proof (or satisfactory proof)."  205 F.3d 327, 332 (7th Cir. 2000).  The Seventh Circuit explained:

> Obviously a plan will not — could not, consistent with its fiduciary obligation to the other participants — pay benefits without first making a determination that the applicant was entitled to them.  The statement of this truism in the plan document implies nothing one way or the other about the scope of judicial review of his determination any more than our statement that a district court "determined" this or that telegraphs the scope of our judicial review of that determination.  That the plan administrator will not pay benefits until he receives satisfactory proof of entitlement likewise states the obvious, echoing standard language in insurance contracts not thought to confer any discretionary powers on the insurer.

*Id.*; *see also Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639 (7th Cir. 2005) ("No single phrase such as 'satisfactory to us' is likely to convey enough information to permit the employee to distinguish between plans that do and plans that do not confer discretion on the administrator.").  In so holding, Seventh Circuit rejected prior precedent suggesting a contrary result.  *See Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505 (7th Cir. 1995) (plan language stating that "benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to time required, of such disability" conferred discretion); *see also Donato v. Metro. Life Ins. Co.*, 19 F.3d 375 (7th Cir. 1994) (plan terms requiring an administrator to pay benefits "upon receipt of proof," which proof "must be satisfactory to us [the administrator]," granted the administrator discretionary authority).

The Ninth Circuit has also concluded that plans requiring submission of satisfactory proof to a plan administrator do not trigger arbitrary and capricious review.  In *Kearney v. Standard*

18

*Insurance Co.*, the Ninth Circuit, sitting en banc, held that plan language requiring an administrator to pay benefits "upon receipt of satisfactory written proof" that the beneficiary had become disabled did not unambiguously confer discretion upon the defendant-insurance company so as to warrant deferential review.  175 F.3d 1084, 1087-90 (9th Cir. 1999) (en banc) (rejecting contrary analysis in *Snow v. Standard Ins. Co.*, 87 F.3d 327 (9th Cir. 1996)).  In *Thomas v. Oregon Fruit Prods. Co.*, 228 F.3d 991 (9th Cir. 2000), the Ninth Circuit extended its decision in *Kearney* to plans requiring payment of benefits upon submission of "satisfactory proof of total disability to us [the defendant]." Such language, the court concluded, could mean either that: (1) proof satisfactory to the defendant must be submitted to the defendant; or (2) proof satisfactory to a reasonable person must be submitted to the defendant.  Since the second interpretation would not confer discretion, the court held that the policy was ambiguous and therefore must be construed in favor of the insured, rendering *de novo* review appropriate.

The Second, Fourth, Eighth and Tenth Circuits have also concluded that the language "satisfactory proof to us," where "us" refers to the insurance company administering the plan, does not authorize the exercise of discretion, and, accordingly, have applied *de novo* review to claim denials pursuant to such plans.  *Ray v. Unum Life Ins. Co. of Am.*, 314 F.3d 482, 485 (10th Cir. 2002) ("[R]equiring satisfactory proof alone, without specifying *who* must be satisfied, does not vest a plan administrator with discretion.  Rather, it merely indicates that proof of disability must satisfy some objective criteria."); *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 269-70 (4th Cir. 2002) (since language was susceptible to two interpretations, no clear grant of discretion existed, especially since "an insured employee reading this language would most likely interpret 'to us' as an indication of where to submit the proof, not as granting [defendant] discretion to determine

whether the proof was satisfactory");[7] *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("The problem is that 'to us' is ambiguously located.  Does it modify 'submits,'so that it merely confirms how the insured starts the claims process, or does it modify 'satisfactory,' signaling an intent to confer discretion and thereby obtain the deferential review under ERISA that an insurer normally does not have when its claims decisions are judicially reviewed?"); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (noting that "unless a policy makes it explicit that the proof must be satisfactory *to the decision-maker*, the better reading of 'satisfactory proof' is that it establishes an objective standard, rather than a subjective one").

The Sixth Circuit, however, reached a different conclusion in *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996).  The plan at issue required the insured to "submit[] satisfactory proof" to the defendant-insurance company in order to receive benefits.  The court held that this phrase conferred sufficient discretion to trigger arbitrary and capricious review because "[a] determination that evidence is satisfactory is a subjective judgment that requires a plan administrator to exercise his discretion."  *Id.* at 381.  According to the Sixth Circuit, "[i]t would not be rational to think that the proof would be required to be satisfactory to anyone other than [the] defendant" since "there is no reason to believe that someone other than the party that received the proof would make a determination regarding its adequacy."  *Id.*; *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 558 (6th Cir. 1998) (en banc) ("A determination that evidence is satisfactory is a subjective judgment that requires a plan administrator to exercise his discretion.").  The Eleventh Circuit has also declared that language requiring submission, to the administrator, of "satisfactory proof" confers discretion.

---

[7] The Fourth Circuit acknowledged that it took a contrary position in an unpublished opinion, *Wilcox v. Reliance Standard Life Insurance Co.*, Appeal No. 98-1036, 1999 WL 170411 (4th Cir. Mar. 23, 1999), but nevertheless rejected that view.  *See Gallagher*, 305 F.3d at 270 n.6.

*Tippet v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227 (11th Cir. 2006).[8]

The majority of courts in this district have concluded that the language "satisfactory proof to us" implicitly grants discretion to a plan administrator, and have applied a deferential standard in reviewing such claims. *See Marques v. Reliance Standard Life Ins. Co.*, Civ. A. No. 99-2033, 1999 WL 1017475, at *2 (E.D. Pa. Nov. 1, 1999) ("The Policy requires that a claimant provide 'satisfactory proof' of disability and provides the necessary discretion."); *Landau v. Reliance Standard Life Ins. Co.*, Civ. A. No. 98-903, 1999 WL 46585, at **3-4 (E.D. Pa. Jan. 13, 1999) (policy requiring that claimant submit "satisfactory proof of Total Disability to us" conferred discretion because it requires administrator to be convinced that claimant is disabled); *Sciarra v. Reliance Standard Life Ins. Co.*, Civ. A. No. 97-1363, 1998 WL 564481 (E.D. Pa. Aug. 26, 1998) (following Sixth Circuit's decision in *Perez*; only reasonable interpretation of plan is that insurance company is making the conclusion as to whether the proof is satisfactory); *see also Murphy v. Metro. Life Ins. Co.*, Civ. A. No. 01-1351, 2001 WL 1167489 (E.D. Pa. Sept. 14, 2001); *Krause v. Modern Group, Ltd.*, 156 F. Supp. 2d 437 (E.D. Pa. 2000); *Friess v. Reliance Standard Life Ins. Co.*, 122 F. Supp. 2d 566 (E.D. Pa. 2000).[9]  Many of these cases relied on the Third Circuit's decision in *Pinto*

---

[8] In *Tippet*, the Eleventh Circuit concluded that it was bound by its prior decision in *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001), which concluded that the same language gave an administrator discretion as to benefits determinations.  Although *Levinson* applied the arbitrary and capricious standard, it provided little analysis on this issue, possibly because the parties agreed to a deferential standard of review.  *Levinson*, 245 F.3d at 1325.

[9] LINA directs the Court to *Schlegel v. Life Insurance Co. of North America*, 269 F. Supp. 2d 612 (E.D. Pa. 2003), which involved a policy identical to the one at issue here.  The court in that case applied an arbitrary and capricious standard of review, but focused solely on the impact of a structural conflict on the standard without addressing whether the language itself expressly or implicitly conferred discretion.

*v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 379 (3d Cir. 2000), in which the court applied a heightened arbitrary and capricious review when the policy required an insured to submit "satisfactory proof" of "total disability" to the defendant.   *See, e.g.*, *Murphy*, 2001 WL 1167489, at *3; *Friess*, 122 F. Supp. 2d at 574.   But in *Pinto*, the parties agreed that the plan conferred discretion on the defendant and thus, the court did not directly address the issue.[10]  *Pinto*, 214 F.3d at 379.   Furthermore, although many of these cases relied on the Sixth Circuit's opinions in *Yeager* and *Perez*, which are still good law, they also relied on cases from other circuits that have since been rejected, as discussed above.   *See, e.g.*, *Friess*, 122 F. Supp. 2d at 574 n.20; *Landau*, 1999 WL 46585, at *3.   Thus, these cases have diminished persuasive value in light of the current legal landscape.[11]   Regardless, this Court is convinced that *de novo* review applies based on those decisions that have deemed policy language similar to that at issue here not to confer discretion.

This Court's decision is bolstered by a recent case from this District in which Judge Pratter applied *de novo* review despite plan language stating that "Total Disability [under the plan] exists

---

[10] *Landau* indicates that in a prior unpublished opinion in the *Pinto* litigation, the Third Circuit "specifically found" that this provision conferred discretion even though the parties agreed to it.  *Landau v. Reliance Standard Life Ins. Co.*, 1999 WL 46585, at *3 n.2.  This earlier opinion has since been vacated.  *See Pinto v. Reliance Standard Life Ins. Co.*, 156 F.3d 1225 (3d Cir. 1998) (Table).

[11] In *Russell v. Paul Revere Life Insurance Co.*, the court concluded that plan language stating that benefits would not be paid unless the defendant-insurance company "receive[d] satisfactory written proof of loss" sufficiently conferred discretion on the defendant.  148 F. Supp. 2d 392, 400 (D. Del. 2001), *aff'd*, 288 F.3d 78, 82 (3d Cir. 2002).  In so holding, the court relied on precedent from other circuits, much of which is now invalid, and noted that the plaintiff conceded, in his filings, that the defendant had discretion to administer the plans.  *Id.* at 401.  Although the Third Circuit affirmed this conclusion without analysis in a three-sentence paragraph, the plaintiff's concession clearly played a role in its conclusion.  *Russell v. Paul Revere Ins. Co.*, 288 F.3d at 82.  The absence of any such concession here, makes this case distinguishable.

when Prudential [the defendant] determines" that certain conditions are met. *Elms v. Prudential Ins. Co. of Am.*, Civ. A. No. 06-5127, 2008 WL 4444269, at *13 (E.D. Pa. Oct. 2, 2008). The court recognized a circuit split on the issue, akin to the one here, and chose to follow the approach of the Second, Fourth and Seventh Circuits in concluding that the language "when Prudential determines" did not grant the defendant discretionary authority:

> 'Discretionary authority' is not conferred by the mere fact that a plan requires a determination of eligibility or entitlement by the plan administrator. Although courts have held that a plan need not use the precise terms 'discretion' or 'deference,' the terms of the plan must clearly set forth a *subjective* standard in order to warrant arbitrary and capricious review. In other words, language that merely sets forth an *objective* standard that an administrator must follow does *not* reserve discretion to the administrator. The Prudential Policy at issue here merely sets forth objective criteria and standards that Prudential must act in accordance with before making benefits determinations. The Policy does not clearly, expressly or even impliedly, reserve discretion for Prudential to define when 'Total Disability' exists according to its subjective qualifications.

*Elms*, 2008 WL 4444269, at *13 (citations omitted). To hold otherwise, the court concluded, would run contrary to *Firestone's* mandate that *de novo* review is the default standard of review absent a clear grant of discretion to the administrator. *Id.*

Having considered all of these authorities, this Court is persuaded that the approach adopted by the majority of the circuit courts is correct. The Plan language stating that "[s]atisfactory proof of Disability must be provided to the Insurance Company [LINA] . . . before benefits will be paid," could mean either that a beneficiary must provide to LINA proof that is objectively satisfactory or that the beneficiary must provide LINA with proof that LINA concludes is satisfactory. Given this ambiguity, the Plan must be construed in favor of the Plaintiff. *See Heasley*, 2 F.3d at 1258. Furthermore, this Court agrees with the Seventh Circuit's conclusion that merely requiring submission of proof, even "satisfactory" proof, does not clearly confer discretion upon an

administrator, but instead clarifies that a beneficiary must support his benefit claim with proof of disability.  *Herzberger*, 205 F.3d at 332.  Accordingly, this Court will review LINA's denial of benefits under a *de novo* standard.

### B.    LINA Improperly Denied Plaintiff Long Term Disability Benefits

The parties do not dispute that Plaintiff suffered from RSD.  (Pl.'s Mot. ¶ 6; Defs.' Opp'n to Pl.'s Mot. for Summ. J. [hereinafter Defs.' Opp'n] ¶ 6.)  Although LINA acknowledges that Plaintiff's condition worsened after its initial denial of benefits, LINA maintains that Plaintiff did not satisfy the "any occupation" standard because she was capable of performing sedentary work on October 12, 2006, the date on which she was required to satisfy that standard.  (Defs.' Mem. at 16.) LINA's position is based on: (1) Dr. Carr's PAA; (2) the transferable skills analysis, which was, in turn, based on Dr. Carr's PAA; (3) Dr. Topper's report, which concluded that Plaintiff could perform sedentary work on October 12, 2006; and (4) the lack of specific functional limitations in Drs. Mandel, Tweedy and Soiferman's notes.  (*Id*. at 11-16.)

Despite acknowledging that Plaintiff's "condition varies," (Defs.' Opp'n at 5), Defendants' denial of benefits was premised on a snapshot of Plaintiff's condition, as it existed on or about October 12, 2006.  Although this may be an appropriate starting point, whether Plaintiff was capable of performing "any occupation" must be considered in light of both her functional capabilities at that time, her complete medical history, and the nature of her disorder.  *See Addis v. Ltd. Long-Term Disability Program*, 425 F. Supp. 2d 610, 615 (E.D. Pa. 2006) (a claimant's condition and limitations must be analyzed in the context of the claimant's disorder), *aff'd*, 268 F. App'x 157 (3d Cir. 2008).

Plaintiff had a well-documented case of RSD, a chronic disorder that often worsens over

24

time, and she consistently exhibited objective and subjective signs of RSD.   Dr. Topper's review

of Plaintiff's medical history indicates that Plaintiff's condition worsened through 2004 and 2005,

and Dr. Tweedy's first PAA indicated that as of late 2005 or early 2006, Plaintiff was incapable of

performing basic functions necessary for sedentary work.  (Defs.' Mot. Ex. G at LINA00186; Pl.'s

Mot. Ex. A at LINA00620-621.)  As late as July 2006, Plaintiff was wearing loose clothing because

she was experiencing severe pain in her leg.  (Pl.'s Mot. Ex. A at LINA00442.)  Furthermore, Dr.

Getson's note indicates that, as of September 8, 2006, Plaintiff's symptoms were worsening and she

was having difficulty walking.  (*Id.* at LINA00382.)

The next notes in the record before the Court pertain to Plaintiff's visits with Drs. Carr and

Mandel on September 29, 2006.  In his report, Dr. Carr stated, in response to another doctor's IME,

that Plaintiff did not exhibit RSD at that time.  (Defs.' Mot. Ex. M at LINA00220.)  However, Dr.

Carr clarified that he only intended to convey that a doctor who only observes Plaintiff on one

occasion might not appreciate the extent and severity of her condition since all of her symptoms do

not necessarily appear at any one time.  (*Id.*; Defs.' Mot. Ex. W at LINA00270.)  Furthermore,

despite Dr. Carr's conclusion that Plaintiff did not have RSD at the time, his report indicates that she

was, in fact, exhibiting allodynia, and shiny, discolored skin.  (Defs.' Mot. Ex. M at LINA00220.)

Plaintiff visited Dr. Mandel for an evaluation of her upper extremities in connection with the car

accident.  (Defs.' Mot. Ex. N.)  This visit is thus irrelevant to the status of her RSD in her left leg,

other than to note that the doctor sought nerve blocks to prevent the spread of RSD to her right upper

extremity.  (*Id.*)

Dr. Carr's PAA, which indicated that Plaintiff could sit continuously throughout the

workday, coupled with the Transferable Skills Analysis, support a conclusion that Plaintiff could

have performed sedentary work at that time.  (Defs.' Mot. Ex. L & Ex. O.)  However, Dr. Tweedy's

October 20, 2006 PAA indicated that Plaintiff could only sit occasionally and could only tolerate

twenty or twenty-five minutes of sitting before changing position.  (Defs.' Mot. Ex. R.)  Contrary

to Defendants' contention that Dr. Tweedy failed to provide specific limitations, he explained that

Plaintiff "cannot remain in any one position for more than very short periods, and sometimes cannot

tolerate even the touch of clothing on her left leg."  (*Id.* at LINA00416.)  Dr. Tweedy's PAA also

illustrates that Plaintiff was incapable of sitting, standing, walking, lifting, carrying, or grasping with

her right hand on more than an occasional basis. (*Id.*)

Subsequent records indicate that Plaintiff's RSD again worsened, that she was still

undergoing treatment, and that by March 12, 2007, her RSD was so severe that Dr. Schwartzman,

a "renown[ed] expert" in RSD, and Dr. Topper both concluded that she was incapable of working

in any capacity.  (Defs.' Mot. Ex. G at LINA00186.)

Viewing Plaintiff's condition on October 12, 2006 in light of the entire administrative record

before the Court, it is clear that Plaintiff's improvement was merely temporary.  Certainly an

insurance company is permitted to terminate benefits when doctors render conflicting opinions and

the evidence can support either a determination that a claimant is disabled or that she is not disabled.

However, an insurance company must look at the record as a whole to determine whether the

claimant is, in fact, disabled within the meaning of the Plan policy.  *See Leger v. Tribune Co. Long*

*Term Disability Benefit Plan*, 557 F.3d 823, 833 (7th Cir. 2009).  This is particularly true when an

individual has a chronic disorder that is known to occasionally relieve but then worsen.

In this case, viewing the evidence in a light most favorable to LINA, Plaintiff's RSD at most

improved for two weeks before her symptoms reappeared and then severely worsened to the point

that even LINA's peer review physician acknowledged total disability.  Thus, even though Plaintiff might have been capable of sedentary work on the particular day that she was required to satisfy the "any occupation" standard, it is clear that she could not sustain any meaningful employment, since her RSD worsened shortly thereafter, rendering her incapable of performing even sedentary work.[12] In light of the record as a whole, LINA's decision to terminate Plaintiff's benefits was incorrect because it failed to consider whether its conclusion that Plaintiff could perform sedentary work on October 12, 2006 was reasonable in light of the nature of her disability and medical records indicating that her RSD at most only temporarily improved.  Common sense dictates that an individual with a chronic disorder, who is precluded from all work when the disorder is at its worst, does not suddenly become capable of working because of a fleeting relief of symptoms.[13]  Plaintiff has a long, documented history of RSD, has undergone several treatments which failed to yield long term relief, and exhibited an inability to work when she experienced symptoms (as documented by Dr. Tweedy's earlier PAA, Dr. Schwartzman's conclusions, and Dr. Topper's report).  Accordingly, by relying on a short-term period during which Plaintiff's symptoms improved without appraising that period in the context of Plaintiffs other records, Defendants improperly terminated Plaintiff's

---

[12] Defendants rely on Plaintiff's initial return to work in 2004, after she was first diagnosed with RSD, to support their argument that she could have worked in 2006.  (Defs.' Mem. at 16.)  Although Plaintiff recovered from her initial knee injury, she did not recover from her second knee injury and related RSD.

[13] A recent amendment to the Americans with Disabilities Act reflects this concept.  It instructs courts that, for purposes of that statute, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended at 42 U.S.C. § 12102(a)(4)(D) (2009)).

benefits.[14]

**C.    Remedy**

       *1.    Plaintiff is entitled to a retroactive award of benefits*

       When benefits have been improperly denied, a district court has discretion to "either remand

the case to the administrator for a re-evaluation of the claim or retroactively award benefits." *Addis*,

425 F. Supp. 2d at 620 (citing *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 24 (1st Cir.

2003)); *see also Carney v. Int'l Brotherhood of Elec. Workers Local Union 98 Pension Fund*, 66 F.

App'x 381, 386-87 (3d Cir. 2003).   The denial of benefits in this case was based on LINA's

improper conclusion that Plaintiff did not satisfy the "any occupation" standard, and not on a

misinterpretation of Plan documents or an incomplete administrative record.   Therefore, an award

of retroactive benefits from October 13, 2006 is appropriate.   *See Addis*, 425 F. Supp. 2d at 621

(awarding retroactive benefits as a remedy for improper denial of benefits).   Additionally, Plaintiffs'

long term disability benefits will be reinstated subject to the terms of the Plan policy and her

continued eligibility for those benefits.[15]   *See Cook*, 320 F.3d at 25.

       *2.    Plaintiff is entitled to prejudgment interest*

       A district court has discretion to award prejudgment interest on a judgment awarding benefits

to an ERISA plan participant who prevails on a § 1132(a)(1)(B) claim and to determine the

appropriate rate of prejudgment interest.   *See Skretvedt v. E.I. Dupont De Nemours*, 372 F.3d 193,

---

       [14] Perhaps recognizing that Plaintiff's condition could not be so narrowly viewed, Defendants' own claims file notes that Dr. Topper's report was "ambiguous" even though the doctor opined that Plaintiff was capable of sedentary work during the fall of 2006.  (Pl.'s Mot. Ex. A at LINA00022.)

       [15] The Plan requires Plaintiff to provide "continued proof" of her disability to LINA "for benefits to continue."  (Defs.' Mot. Ex. B at 18.)

195-96, 205-06, 208 (3d Cir. 2004).  An award of prejudgment interest compensates prevailing parties for the true costs of damages incurred and both promotes settlement and deters attempts to benefit from the inherent delays of litigation.  *Id.* at 208.  As a general principle, "prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable."  *Id.* (quoting *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992)).

Since Plaintiff has been deprived of her benefits for two and a half years, the true value of her damages includes not only the amount of benefits owed, but any interest that would have accumulated during that time.  Thus, Plaintiff is entitled to an award of prejudgment interest to make her whole.

## IV.    CONCLUSION

Plaintiff's RSD rendered her incapable of performing "any occupation."  Defendants' decision to terminate her long term benefits relied improperly on a brief improvement in Plaintiff's condition.  Plaintiff is therefore entitled to reinstatement of her benefits and to recover benefits owed from October 13, 2006, the date on which her benefits were terminated, to the date of judgment.  She is also entitled to recover prejudgment interest.  Judgment will be entered accordingly, pending receipt of the parties' statements as to the exact amount owed to Plaintiff.